UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | |
| | * | Criminal Action No. 22-30027-MGM |
| CARLOS GONZALEZ, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING
MOTION TO SUPPRESS
(Dkt. No. 51)

December 18, 2023

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

Defendant Carlos Gonzalez has filed a Motion to Suppress, seeking an order suppressing all evidence seized on January 25, 2022 from the search of his residence at 8 Mereline Avenue in East Longmeadow, Massachusetts. Defendant argues the affidavit in support of the search warrant failed to establish probable cause to believe contraband would be found at the residence at the time the warrant was executed because the affidavit relied on stale information and lacked a sufficient nexus between the place to be searched and the items sought. For the following reasons, the court grants Defendant's motion and suppresses the evidence obtained from the search.

## II. BACKGROUND

On January 20, 2022, Special Agent Scott Smith of the United States Department of Justice, Drug Enforcement Administration ("DEA") applied for a warrant to search 8 Mereline Avenue

(Defendant's residence) in relation to the alleged manufacture and distribution of counterfeit Oxycodone pills with fentanyl. Attached to the warrant application was an affidavit signed by Smith which set forth the basis for probable cause. (Case No. 22-mj-03006, Dkt. No. 4-1 ("Aff.")).

The affidavit detailed a multi-year investigation into a counterfeit and fentanyl pill manufacturing operation led by Michael Matos. Michael Matos and his wife, Neysha Matos, purchased 8 Mereline Avenue in January 2018 and lived on the second-floor apartment until September 2021, when they moved into another residence in Somers, Connecticut. Agents believe Michael and Neysha Matos purchased the Somers home in July 2021. Defendant and Kiara Rodriguez-Santiago lived on the first floor of 8 Mereline Avenue. The residence also had a basement, which Agent Smith believed could only be accessed from a bulkhead door located in the rear of the residence.

The affidavit recounts, nearly 4 years before the search warrant in this case was issued, the February 2018 discovery and seizure of three pill bottles containing various tablets from a Snap-On Tools Company toolbox repossessed from Michael Matos. A special agent with the U.S. Food and Drug Administration ("FDA") sent the evidence to a forensic laboratory for analysis. In July 2018, the laboratory reported that one of the retail pharmacy pill bottles contained nine light blue ½ scored, round tablets debossed with an "M" on one side and "30" on the other, and 49 light yellow round tablets debossed with "TL 177" on one side. Another of the pill bottles contained additional light blue ½ scored, round tablets debossed with the "M" on one side and "30" on the other. The laboratory analysis found heroin was present in the light blue "M"/"30" tablets. The affidavit explained that "M30" is the mark used by the FDA registered drug manufacturer Mallinckrodt Pharmaceuticals to mark the 30 mg oxycodone tablets they manufacture.

In July and August 2018, the East Longmeadow Police Department conducted two motor vehicle stops on Lombard Avenue near "the area" of 8 Mereline Avenue. During the July 2018 stop, officers recovered baggies with approximately 20 blue tablets debossed with "A 215" and 4 gray tablets

debossed with "k 57," which a search of the drugs.com database revealed to be oxycodone 30 mg and 20 mg tablets, respectively. The FDA later determined that the "A 215" tablets were counterfeit. During the August 2018 stop, officers discovered approximately 12.1 grams of heroin and "blowout" bags, which are commonly used to package powder narcotics. The operator of the vehicle told officers he was being paid by an unidentified individual to deliver the heroin to another unidentified individual in East Longmeadow; the affidavit does not clarify whether the operator provided any other specific information about who he was working with or where he was traveling to or from at the time he was stopped. He was arrested and charged with various motor vehicle charges and possession with intent to distribute a class A substance (heroin). Commercial database searches revealed the person who paid the operator's bail used 8 Mereline Avenue as an address for an unknown creditor on September 8, 2018. Additionally, the operator of the vehicle had previously operated a tow truck owned by Neysha Matos and registered to 43 Springfield Street Inc. at 8 Mereline Avenue in East Longmeadow.

In February 2019, the FDA conducted an investigation into Michael Matos after learning he had been making numerous online purchases for several years of items commonly utilized to manufacture counterfeit controlled substances. Although a February 23, 2019 search warrant for a particular email address used by Matos to order these items resulted in obtaining "valuable information" regarding Matos' operation, the investigation did not result in the issuance of any further warrants. The affidavit does not specify what "valuable information" was gleaned from execution of the February 2019 warrant.

Beginning in June 2020 to March 2021, agents with the Drug Enforcement Administration ("DEA") conducted several undercover money pickups, which culminated in the search and seizure of a large-scale fentanyl pill processing operation in Springfield, MA on April 5, 2021. On that same date, one of the individuals involved in that pill operation ("CI-1") agreed to cooperate with DEA agents. CI-1 told agents he had a partner ("CI-2") in the pill milling operation and that he and his

partner had been manufacturing counterfeit oxycodone tablets for approximately one year. CI-1 stated they had learned how to make counterfeit oxycodone tablets via the internet and that CI-2 had also learned the process from a person named "Mikey," who owned a BMW and a Tesla and lived in the area of the Friendly's Restaurant in East Longmeadow. According to CI-1, CI-2 had been to "Mikey's residence and observed a pill press operation there. The affiant determined that 8 Mereline Avenue was located approximately 0.3 miles from the Friendly's Restaurant on North Main Street in East Longmeadow, and confirmed that Neysha Matos has both a 2014 BMW and a 2015 Tesla registered in her name at 8 Mereline Avenue, 2nd Floor, East Longmeadow. Based on this information, affiant stated his belief that "Mikey" referred to Michael Matos and that the residence at which CI-2 observed a pill press operation was 8 Mereline Avenue.

In June 2021, the affiant and other agents conducted an interview with CI-2. He explained that approximately a year and a half ago, he and CI-1 learned of a profitable pill press operation being run by a man named "Mikey." CI-2 first met "Mikey" at an auto body shop in Agawam, MA ("Target Location 2") owned and operated by Hector Ramos, where "Mikey" kept a tableting machine in the garage and showed CI-2 how it worked. CI-2 stated "Mikey" carried the tableting machine in a large suitcase wrapped within a comforter and he had a second suitcase to carry all of the other processing equipment. CI-2 met with "Mikey" on three additional locations at "Mikey's" residence on Mereline Avenue in East Longmeadow near the Friendly's Restaurant. Each of the three times CI-2 went to "Mikey's" residence, he brought 10-20 grams of heroin, and "Mikey" would mix and process the heroin into counterfeit oxycodone tablets using a pill press machine in the basement, which they would enter via a bulkhead door in the back of the house. On one occasion, "Mikey" allowed CI-2 to enter the first floor of the residence in order to use the restroom. CI-2 stated that each time he was at the residence, there were "young people" around who he believed to be "Mikey's" relatives and these "young people" would sometimes operate the tableting machine for "Mikey." CI-2 told agents that

4

"Mikey" had counterfeit dies to produce counterfeit oxycodone tablets of 15, 20, and 30 mgs, but that he was only producing the 30 mg tablets at that time because they were more profitable. "Mikey" also provided CI-2 with several websites where he could purchase the supplies and equipment needed to manufacture the tablets. CI-2 informed agents the last time he went to the Mereline residence was in April or May of 2020, approximately one year and nine months before the search warrant that is the subject of this motion.

The affidavit also details several packages ordered and/or sent to 8 Mereline Avenue in 2020 and 2021. On December 29, 2020, Customs and Border Patrol officers seized a parcel that was to be delivered to Neysha Matos at 8 Mereline Avenue. The parcel, labeled as a roll forming machine, was opened during a customs inspection to reveal a pill press encapsulating machine. Records indicate Kiara Rodriguez was the listed recipient of packages with the same item, a roll forming machine, labeled on the manifest on June 13, 2020 at 8 Mereline Avenue. In an interview conducted with another individual ("CI-4") on September 14, 2021, agents from the New Haven DEA office learned that Kiara Rodriguez, with the 8 Mereline Avenue address, purchased a pill press punch set with an "M" and "15" on February 16, 2021. CI-4 also reported that the Defendant, Carlos Gonzalez, using the 8 Mereline Avenue address and a phone number associated with Michael Matos, purchased two pill press punch sets with "A|215" on May 1, 2021. During the weeks of July 11, 2021 and August 30, 2021, investigators, through a person known as "CI-3," conducted two controlled purchases of blue counterfeit OxyContin pills stamped with "A|215" from Target Location 2.[1] Laboratory testing later confirmed the counterfeit pills from the July 2021 controlled purchase contained fentanyl.

---

[1] Investigators also made controlled purchases of cocaine from the auto body shop at Target Location 2 during the first week of July 2021 and the week of September 27, 2021, as well as another controlled purchase at Target Location 2 of counterfeit OxyContin pills stamped with "M" on one side and "30" with an underscore on the other during the week of December 6, 2021.

On July 12, 2021, CI-1 informed agents that a 2006 Acura MDX belonging to Michael Matos was involved in a motor vehicle accident, had been towed to a CJ's Towing lot in Springfield, and was believed to have a hidden compartment with a large quantity of fentanyl. CI-1 told agents he learned this information from someone who he believes to be a fentanyl supplier for Matos' operation ("Source-1") and he had been shown a CJ's Towing sheet with the vehicle make and model as well as the VIN, which he recalled ending with "58." CI-1 had been told by Source-1 that Neysha Matos was operating the vehicle at the time of the accident and she signed ownership of the vehicle over to CJ's Towing because it was a complete loss after the accident. Affiant contacted CJ's Towing, learned the vehicle had been involved in an accident on June 20, 2021, learned it had been sold to Leveille's Auto Recycling in Somers, CT, and ultimately located the vehicle on July 13, 2021. Based on the registration information provided by the CJ's Towing representative, affiant learned the vehicle was registered to Keanu Vega with an address in Chicopee, MA; a subsequent search of Vega's name in a commercial database listed Kiana L. Rodriguez at the same address. Affiant recognized the second person's name because he had observed another vehicle registered to Kiana Rodriguez parked on the front lawn of 8 Mereline Avenue on May 24, 2021.

Upon locating the 2006 Acura MDX at Leveille's Auto Recycling on July 13, 2021, agents confirmed it was the same vehicle by matching the VIN and obtained consent to search it from a manager at the auto shop. A search of the vehicle turned up a small black bag containing 25 rounds of 9mm ammunition and an aftermarket hidden compartment under the floor in the rear of the vehicle, which contained two clear bags each holding a small quantity of green tablets embossed with an "A" over the number "214." A search on drugs.com revealed that round green pills embossed with A over 214 are 15 mg oxycodone tablets. Affiant obtained the Motor Vehicle Crash Police Report from the Springfield Police Department and noted, through a series of database searches, that the listed operator's mother's name had been listed as a subscriber to two telephone numbers known to

be used by Michael Matos. Given that the registered owner and listed operator of the vehicle appeared to have connections to Michael Matos and/or 8 Mereline Avenue, affiant stated his belief that the green "A 214" tablets seized from the vehicle were counterfeit tablets manufactured by Matos' operation.

On September 6, 2021, affiant conducted surveillance of the home purchased by Michael and Neysha Matos in Somers, CT and observed a U-Haul box truck backed up to the residence. Based on this surveillance, the affidavit posited Michael and Neysha Matos moved their primary residence on September 6, 2021 from 8 Mereline Avenue to the Somers, CT home. The affidavit details additional surveillance conducted at 8 Mereline Avenue on September 13, 2021, observing Matos and Defendant leaving the home at 3:14 p.m. and travelling directly to the auto body shop at Target Location 2. At 3:42 p.m., agents observed Matos exiting the driver's side of a blue Chevy pickup, which was registered to Defendant, and beginning to talk to Hector Ramos, the operator of the shop, in the parking lot. Matos and Ramos then entered the office next to the garage and Matos waved toward Defendant, who was still sitting in the passenger seat of the Chevy pickup. Defendant exited the truck at 3:43 p.m., greeted Ramos, then walked into the office with Matos and Ramos. At 3:54 p.m., Matos, Ramos, and Defendant approached a black Audi parked in front of the garage. While Ramos appeared to show Matos the Audi, Defendant walked back over to the Chevy pickup and repositioned it in the parking lot. At 4:00 p.m., Matos walked back to the blue Chevy and entered the driver's seat while Defendant and an unknown male entered a blue Ford F-150 that was parked in the parking lot. Agents maintained surveillance and observed Defendant in the F-150 travel back to 8 Mereline Avenue, while Matos in the Chevy pickup travelled back to the neighborhood of his new residence in Somers, CT.

On September 16, 2021, agents again established surveillance at 8 Mereline Avenue and observed the blue F-150 leave the residence at 2:13 p.m., travel to a Wendy's drive-thru, return to the residence, then proceed to the commercial garage at Target Location 2, arriving at approximately 3:18

p.m. A few minutes later, a task force officer observed a gray GMC, believed to be the same vehicle agents had seen Matos operating earlier in the day while conducting a suspected narcotics transaction, exit the parking lot of Target Location 2. Shortly thereafter, agents observed an unknown male place a black garbage bag in the bed of the blue F-150 and the F-150 then exited the parking lot as well. Surveillance units followed the F-150 to the Walmart on Springfield Road in Westfield, MA. Four males, including Defendant, exited the vehicle, entered the store, and then left the store at approximately 3:56 p.m. with a cart full of items. The men loaded the items into the bed of the F-150 and left the parking lot at approximately 3:59 p.m. Surveillance footage and a receipt obtained from Walmart a few days later revealed that Defendant paid $461.45 in cash for a number of items, detailed in the affidavit, which are commonly used to process narcotics. Agents followed the F-150 from Walmart to a residence at 49 Norman Street in Springfield, where at 4:25 p.m. the vehicle backed into the driveway of a two-car garage and parked so the rear bed of the truck was "very close" to the open garage door. The affidavit notes that all of the occupants got out of the truck and, three minutes after they arrived, Defendant and the three other men re-entered the F-150 and drove back to 8 Mereline Avenue.

Additional surveillance observed Michael Matos visiting 8 Mereline Avenue for a period of several hours on November 3, 2021, leaving at approximately 2:48 p.m. with a couple of boxes "roughly the same size as the boxes dropped off earlier in the day by Amazon," which were placed in the bed of his truck before departure.[2] Surveillance units watched Matos' truck depart and turn onto Route 83, but lost sight of the truck shortly thereafter. Later that day, at approximately 3:26 p.m., an agent observed a black Acura TL sedan park on the street in front of 8 Mereline Avenue. The vehicle

---

[2] Agents also observed "several large boxes and a paper and/or soft parcel type bag" being brought into the front door of 8 Mereline Avenue on May 4, 2021 by a different person, who then returned to his vehicle and left shortly thereafter.

was noted to be registered at the same address that was given by the man found with heroin in his vehicle after being stopped for a motor vehicle offense near 8 Mereline Avenue on August 31, 2018.

On January 6, 2022, agents also observed Michael and Neysha Matos at the Mereline residence. Neysha Matos was seen leaving the property at approximately 1:40 p.m. in a black 2017 Tesla Model X; she was surveilled going to Panera Bread and returning to 8 Mereline Avenue. Investigators determined the Tesla was purchased in December 2021 by Michael Matos and another individual, using the 49 Norman Street address Defendant was followed to after leaving the Westfield Walmart in September 2021. Affiant stated he had observed the black 2017 Tesla at 8 Mereline Avenue "on several occasions over the past several weeks." Also on January 6, 2022, between 3:20 p.m. and approximately 4:00 p.m., agents observed a blue Chevy pickup truck registered to Defendant being driven by Michael Matos to the Rocky's Ace Hardware Store in East Longmeadow, then to CVS, and return back to 8 Mereline Avenue. Though the affiant obtained a copy of Mr. Matos' sales receipt from Rocky's Ace Hardware, the affidavit does not describe the items purchased. Around the same time Mr. Matos returned to 8 Mereline Avenue, affiant and another agent observed two vehicles travel down Mereline Avenue, one of which parked in the driveway of 8 Mereline Avenue. Both vehicles left the neighborhood after staying for only a few minutes, but the affidavit contains no information about the vehicles' registration, whether they remained running while parked, if anyone exited the residence and approached the vehicles or vice versa, or whether any such person carried or transferred any items so as to suggest an illicit transaction. At 4:44 p.m., agents further observed the blue Chevy pickup driving on Lombard Avenue and turning onto Route 83, but the affidavit does not specify who was driving at that time and surveillance lost the vehicle in traffic shortly thereafter.

The affidavit concludes by detailing information regarding Michael and Neysha Matos' vehicles, properties, bank accounts, gold purchase, and tow truck business[3] through which agents believe they are laundering the proceeds of the counterfeit pill operation. The affidavit sought authorization to search 8 Mereline Avenue as well as the auto body shop at Target Location 2. On January 20, 2022, Magistrate Judge Katherine Robertson authorized the warrants for both the Mereline residence and Target Location 2.[4] The search of 8 Mereline Avenue was executed on January 25, 2022.

III. Analysis

A. Probable Cause

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "An application for a warrant 'must demonstrate probable cause to believe that (1) a crime has been committed—the commission element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called nexus element.'" *United States v. Roman*, 942 F.3d 43, 50 (1st Cir. 2019) (quoting *United States v. Dixon*, 787 F.3d 55, 59 (1st Cir. 2015)). As to the nexus element, the issuing magistrate judge "must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [her],' there exists a 'fair probability' evidence will be found in the place to be searched." *Id.* (quoting *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999);

---

[3] The tow truck business appears to be associated with a company registered by Neysha Matos called "43 Springfield Street, Inc." Neysha Matos registered the business with the State of Massachusetts on April 22, 2019 using 8 Mereline Avenue as the business address. In a report filed with the Massachusetts Secretary of State on October 18, 2021, Neysha Matos continued to list the street address of the corporation as 8 Mereline Avenue.

[4] Magistrate Judge Katherine Robertson also authorized searches of the two locations on December 10, 2021 "based on a largely identical affidavit." However, the searches were not timely executed for reasons related to the investigation. The only changes from the first affidavit to the second affidavit were the addition of paragraphs 73 through 79, relating to observations made by investigators on January 6 and 7, 2022.

*see also Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought.").

It is well established that "the 'very core' of the Fourth Amendment is to be 'free from unreasonable governmental intrusion' into one's home." *Roman*, 942 F.3d at 50 (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). Indeed, the home in particular is entitled to "the highest level of Fourth Amendment protection." *Morse v. Cloutier*, 869 F.3d 16, 23 (1st Cir. 2017) (quoting *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015)). Of course, "[a] 'nexus . . . need not, and often will not, rest on direct observation, but rather can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of crime].'" *Roman*, 942 F.3d at 51 (quoting *Feliz*, 182 F.3d at 88). "But [the First Circuit has] not permitted this inference to be applied lightly." *Id.* Instead, the First Circuit has "made clear" it does "'not suggest that, in all criminal cases, there will automatically be probable cause to search a suspect's residence,'" and has "rejected a per se rule automatically permitting the search of a defendant's home when he has engaged in [criminal] activity." *Id.* (quoting *Feliz*, 182 F.3d at 88); *see also id.* at 51-52 ("We have further expressed skepticism that probable cause can be established by the combination of the fact that a defendant sells drugs and general information from police officers that drug dealers tend to store evidence in their homes," and instead "have found that generalized observations of this type should be combined with specific observations, or facts connecting the drug dealing to the home to permit an inference of nexus to a defendant's residence." (internal quotation marks omitted)).

The probable cause standard "leaves ample room for reasonable inferences based on common experience: an affidavit submitted to show probable cause need not point to some straight-line

connection but, rather, may rely on the affiant's connecting of a series of dots in a commonsense way." *United States v. Adams*, 971 F.3d 22, 32 (1st Cir. 2020). Consistent with this generous standard, "reviewing courts generally afford substantial deference to a magistrate's determination of probable cause." *Roman*, 942 F.3d at 50. However, while "[t]he probable cause standard 'is not a high bar,'" *Adams*, 971 F.3d at 32 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)), it "cannot be based on conclusory statements, or mere 'suspicion, rumor, or strong reason to suspect [wrongdoing],'" *United States v. Samboy*, 433 F.3d 154, 159 (1st Cir. 2005) (quoting *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999)).

In addition, "[t]he 'commission' and 'nexus' elements in the 'probable cause' analysis each include a temporal component." *United States v. Zayas-Diaz*, 95 F.3d 105, 113 (1st Cir. 1996). That is, "[t]he issuing magistrate must not only consider the accuracy and reliability of the historical facts related in the affidavits, but must determine, *inter alia,* whether the totality of the circumstances reasonably inferable from the affidavits demonstrates a 'fair probability' that evidence material to the 'commission' of the probable crime will be disclosed at the search premises at about the time the search warrant would issue, rather than at some remote time." *Id.*; *see also United States v. Floyd*, 740 F.3d 22, 33 (1st Cir. 2014) ("[A]n affidavit supporting a search warrant must contain timely information or else it will fail." (quoting *United States v. Schaefer,* 87 F.3d 562, 568 (1st Cir. 1996))). "Staleness does not undermine the probable cause determination if the affidavit contains information that updates, substantiates, or corroborates the stale material." *United States v. Bucuvalas*, 970 F.2d 937, 940 (1st Cir. 1992). "When evaluating a claim of staleness, [courts] do not measure the timeliness of information simply by counting the number of days that have elapsed." *United States v. Tiem Trinh*, 665 F.3d 1, 13 (1st Cir. 2011) (quoting *United States v. Morales–Aldahondo,* 524 F.3d 115, 119 (1st Cir. 2008)). Instead, courts consider "various factors, including 'the nature of the information, the nature and

characteristics of the suspected criminal activity, and the likely endurance of the information' in assessing the information's ripeness." *Id.* (quoting *Morales–Aldahondo,* 524 F.3d at 119).

After careful, and deferential, review, this court concludes the affidavit here clearly failed to demonstrate probable cause to believe evidence of an illicit pill-manufacturing operation would be found at 8 Mereline Avenue at the time the warrant was sought and issued. Although the affidavit provided some connection between the residence and suspected criminal activity in 2020 and mid-2021, this information was too stale by the time the government applied for the search warrant in 2022. This is particularly so in light of the Matos' residential move to Somers, CT in September 2021, the easily movable pill-making equipment (detailed in the affidavit as capable of being carried around in a suitcase by Mr. Matos), and the more recent, recurring links to criminal activity at Target Location 2.

The government acknowledges, as it must, that the staleness inquiry is context driven. *See Floyd*, 740 F.3d at 34 (With respect to staleness, "[e]verything depends on context."). Though the affidavit intricately and amply links Michael and Neysha Matos to 8 Mereline Avenue and suspicious activity indicative of an illegal drug operation, all of that information occurred before they moved out of the home and relocated to a Connecticut residence. Such context is critical and, in this case, fatal to the probable cause determination. For example, the 2018 vehicle stops near Mereline Avenue occurred three and a half years before Special Agent Smith applied for the warrant. CI-1 and CI-2 indicated the last time they were at 8 Mereline Avenue—when they observed the pill press operation and learned how to manufacture counterfeit oxycodone pills—was in April or May of 2020, over one and a half years before the warrant application. Likewise, though somewhat more recent, the June and December 2020 parcel deliveries of pill press encapsulating machines to 8 Mereline Avenue still occurred over a year prior to the search warrant application, and the only information provided in the affidavit suggests the general nature of such devices used by Matos' operation were easily movable.

The affidavit is simply bereft of facts that would suggest related evidence of illicit pill manufacturing would continue to be kept at 8 Mereline Avenue as of late January 2022, months after Michael and Neysha Matos moved to Connecticut and years after the described incidents occurred. Any actual link to the home was far too stale under the circumstances to establish probable cause.

While CI-4 described purchases of three pill press punch sets by Kiara Rodriguez-Santiago in February 2021 and Defendant in May 2021, listing 8 Mereline Avenue as the shipping address, the affidavit does not contain any witness observations or other specific information suggesting these items were kept or remained at 8 Mereline Avenue for over 8 months, rather than at a different location. At oral argument, the government argued that such information was not stale because a long-term pill manufacturing operation is something that cannot be easily moved. *See, e.g., United States v. Tiem Trinh*, 665 F.3d 1, 14 (1st Cir. 2011) ("[D]rug operations . . . often germinate over a protracted period of time; thus, information that might otherwise appear stale may remain fresh and timely during the course of the operation's progression.").

However, the affidavit provides no facts from which the court might draw the inference sought by the government in this case, such as the size or weight of the pill press punch sets. In fact, the only pertinent information in the affidavit suggests the equipment *was* easily movable. During an interview in June 2021, CI-2 informed agents that he had previously observed Matos, at the auto body shop, carrying the tableting machine "in a large suitcase wrapped within a comforter" and that he kept all of the other processing equipment in a second suitcase. (Aff. ¶ 40). It is, of course, axiomatic that "[i]f the evidence or contraband described is . . . easily movable, . . . the information about its presence in a particular location has a very short shelf life." *United States v. Wilder*, 2005 WL 1106922, at *5 (D. Mass. May 6, 2005); *United States v. Dumornay*, 2006 WL 3050813, at *4-5 (D. Mass. Oct. 25, 2006) (explaining that "there are substantial reasons for doubting that a highly portable thing . . . might be in the same place where it was last observed fifty days earlier," and concluding such information about

location of a highly portable item  was "too remote in time for it to be relied upon to predict that the search of the premises would discover [it]," as "the issuance of a warrant must rest on something more than plausible speculation").

Tiem Trinh does not militate to the contrary. There, the First Circuit held information regarding the location of a marijuana cultivation scheme was not stale because the materials and equipment associated with that scheme—including "special lights and wiring, humidifying and venting systems, and rooms, lined with foil and other padding, to better cultivate the plants"—were not "items of transient existence" and were "likely to be of use to the operation for a considerable period of time." Tiem Trinh, 665 F.3d at 14. Here, by contrast, the only available information reveals the pill press punches and tableting machines used by Matos's operation were quite easily movable and therefore had a much shorter shelf life than the more permanent, installed equipment described in Tiem Trinh. Such portability renders reports of Defendant's purchase of pill press punch sets in May 2021 stale, with no subsequent events or observations to keep current the likelihood of finding evidence of a crime at 8 Mereline Avenue at the time the warrant was executed.

Moreover, unlike the affidavit in Feliz, where "[n]o other residence or drug-dealing headquarters of [the defendant's] was identified in the affidavit," Feliz, 182 F.3d at 88, the affidavit here did identify other properties associated with the Matos and/or the pill operation—namely, the auto body shop in Agawam as well as the Somers, CT home. See Roman, 942 F.3d at 53–54; United States v. Murray, 480 F. Supp. 3d 342, 359 (D. Mass. 2020). Indeed, not only did CI-2 witness the equipment being transported relatively easily in a suitcase at the auto body shop, but while conducting surveillance on September 6, 2021, agents also observed a U-Haul box truck backed up toward the front door of the Somers home, suggesting items were relocated from 8 Mereline Avenue to the Somers, CT residence in connection with the Matos' move around that time. Thus, even assuming the very portable equipment had been used or stored at 8 Mereline Avenue at some point in time, the

affidavit expressly identified a means, opportunity, and occasion to relocate it to one of the other named locations. Absent any additional evidence, the court concludes it was unduly speculative to believe that any evidence of a pill manufacturing operation spearheaded by Matos would be retained at 8 Mereline Avenue, rather than moved to Target Location 2 or the Somers home, after the Matos' move.

In short, all of the evidence demonstrating a tangible link to 8 Mereline Avenue was impermissibly stale by the time the search warrant was sought. A review of the affidavit reveals only three subsequent instances offered a way to potentially revive the out-of-date information, but for the reasons described below, the court concludes they are all insufficient.

The Walmart surveillance observations, four months before the search warrant, do not refresh the stale information, establish a connection with 8 Mereline Avenue, or meet the probable cause standard. Specifically, the affidavit offers only unsupported speculation for the conclusion that Defendant and his cohorts brought the items purchased at Walmart on September 16, 2021 back to 8 Mereline Avenue. Agents had observed Defendant and the others loading the items from Walmart into the bed of a truck, and then drive directly to Norman Street in Springfield. The affidavit indicates, at 4:25 p.m., "an agent observed the [truck] back into the driveway of a two-car garage" at Norman Street. Then, at 4:27, "an agent[5] observed" there were "no occupants" in the truck, "the overhead door to one of the garages was open," and the truck was "parked so that the rear of the truck was very close to the open garage door." One minute later, at 4:28 p.m., "the agent observed" Defendant and the other three men "re-enter the [truck] and drive away from the residence" to the 8 Mereline Avenue residence in East Longmeadow. Although no detail was provided as to whether agents actually observed any items being unloaded (or affirmatively did not), the three minute Norman Street stop

---

[5] The affidavit refers to "an" agent in two consecutive sentences in paragraph 65, implying the 4:25 and 4:27 observations may have been made by different agents. The affidavit is vague as to this point and it is not clear whether it is describing a period of uninterrupted surveillance or fragmentary.

and its circumstances, as described by the affiant, are consistent with unloading items from the bed of a truck.

With respect to the truck's return to 8 Mereline Avenue, the affidavit contains no description of the truck's positioning, lacks any indication agents saw people exiting the truck or observed items being unloaded from the bed of the truck at 8 Mereline Avenue, and does not detail any other circumstances making it likely, to any degree, that the items were unloaded there, as the affiant surmises. There is simply no factual basis in the affidavit to support such an inference. The affiant's opinion that the items purchased at Walmart were "likely" unloaded at 8 Mereline Avenue, at best, appears to be more conjecture and wishful thinking to fit the Mereline theme, than anything analytical. Even considering the affiant's described law enforcement experience, to simply accept an unsupported and unexplained opinion in the face of reported facts which soundly undermine that opinion would render warrant application review a ministerial task, in contravention of the Fourth Amendment. *See Aguilar v. Texas*, 378 U.S. 108, 111 (1964), *abrogated on other grounds by Gates*, 462 U.S. 213 (the Fourth Amendment precludes a magistrate from "serv[ing] merely as a rubber stamp for the police"); *see also Gates*, 462 U.S. at 239 (a magistrate's determination of probable cause "cannot be a mere ratification of the bare conclusions of others").

The next possible refreshing events are the agents' observations that Michael and Neysha Matos visited 8 Mereline Avenue in November 2021 and January 2022 after they moved to Somers, but these observations likewise do not suffice to establish evidence of criminal activity would be found at 8 Mereline Avenue in late January 2022. The parties do not dispute Michael and Neysha Matos are relatives of Defendant and the facts contained in the affidavit do not suggest these were anything more than innocuous visits to family members who continued to reside in the first floor of 8 Mereline Avenue. *See United States v. Mubarak*, 2022 WL 2971881, at *6 (D. Mass. July 27, 2022) ("[A] familial or similar personal relationship between the suspect and the resident of the home is insufficient to

establish probable cause for purposes of a search warrant without more."). The affidavit articulates no suspicious behavior stemming from these visits, describing nothing more than elementary school child pickups and fast food excursions. To the extent anything more suspect can be surmised from the Matos' interactions with Defendant in general, such as their simultaneous trips to the auto body shop at Target Location 2 on September 13 and 16, 2021, there remains no sign that evidence of the criminal enterprise was taken from or returned to 8 Mereline Avenue on those dates or that any such evidence would otherwise be kept, maintained, or found there, as opposed to at Target Location 2. *See, e.g., United States v. Chalas*, 478 F. Supp. 3d 143, 150 (D. Mass. 2020) (A person's apparent "membership in a drug conspiracy by itself does not—and cannot—establish automatic probable cause for a search of [that] person's home for drugs" or related paraphernalia.); *Mubarak*, 2022 WL 2971881, at *5 ("[E]ven where law enforcement asserts that a large-scale drug organization could keep relevant evidence at multiple locations, that 'does not relieve the government of its burden to provide specific evidence as to each place [to be] searched.'" (quoting *Roman*, 942 F.3d at 54 (second alteration in original))).

Finally, relative to renewing the timeliness of the affidavit's stale information, there are the statements in the affidavit regarding two vehicles "staying for only several minutes" in the Mereline Avenue neighborhood on January 6, 2022. But this information, as reported, provides scant detail and makes absolutely no connection or inference to drug crimes. The affidavit does not expound upon these observations and is notably lacking any specifics sufficient to sustain an inference of criminal activity at 8 Mereline Avenue. Only one of the vehicles was seen parked in the driveway of 8 Mereline Avenue; the other's whereabouts in the neighborhood are left remarkably vague. The affidavit does not specify whether anyone was observed exiting the vehicles and going up to the house or whether anyone was observed leaving the residence and approaching the vehicles. There are no statements as to whether any interactions, transactions, or exchange of items were observed; no indication as to

whether the vehicles remained running while parked; and no data concerning the types of vehicles or their registrations. Such barebones, unconnected, and sparse information is inadequate to refresh or re-establish probable cause.

In sum, the evidence disclosed in the affidavit demonstrating a nexus to 8 Mereline Avenue was too stale in late January 2022 to support a finding of probable cause, in view of all of the circumstances, and no subsequent information was sufficient to revive it. Accordingly, the court concludes that the warrant application for 8 Mereline Avenue was deficient and should not have been approved.

B.  Good Faith

The much closer question, in the court's view, is the appropriate remedy for the Fourth Amendment violations. The government argues that even if the warrants lacked probable cause, the good-faith exception to the exclusionary rule applies and the evidence obtained by the search warrants should not be suppressed. Defendant argues otherwise.

Under the exclusionary rule, "[w]hen a warrant issues without probable cause, the evidence obtained from the resultant search is ordinarily suppressed." *United States v. Sheehan*, 70 F.4th 36, 51 (1st Cir. 2023). "Suppression is inappropriate, though, if the officer who conducted the search acted in reliance upon the defective warrant and that reliance was objectively reasonable." *Id.* "This exception, familiarly known as the 'good-faith exception,' is grounded in the principle that the purpose of suppression is to deter police misconduct, and when law enforcement officers have obtained a search warrant in good faith and acted within its scope, there is nothing to deter." *Id.* (internal quotation marks omitted); *see also Davis v. United States*, 564 U.S. 229, 237 (2011) ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs."). In making this determination, the court must "evaluate all of the attendant circumstances at the time of the warrant application and its execution." *Sheehan*, 70 F.4th at 51 (quoting *United States v. Brunette*, 256 F.3d 14, 17 (1st Cir. 2001); *see United States v. Vigeant*, 176 F.3d 565, 572 (1st Cir. 1999) (describing good faith exception inquiry as "fact-intensive" and "case-by-case [in] nature"). Ultimately, "[t]he government

19

bears the 'heavy burden' of proving that the good-faith exception applies." *United States v. Wurie*, 728 F.3d 1, 13 (1st Cir. 2013) (quoting *United States v. Syphers*, 426 F.3d 461, 468 (1st Cir. 2005)); *see also Sheehan*, 70 F.4th at 51; *United States v. Diehl*, 276 F.3d 32, 42 (1st Cir. 2002).

The court finds the strength (or lack thereof) of the affidavit's probable cause showing to be the most relevant of "the attendant circumstances at the time of the warrant application and its execution." *Sheehan*, 70 F.4th at 51. As set forth above, any information demonstrating a nexus was far too stale by the time of the warrant application to be acceptable and the connection between 8 Mereline Avenue and any *recent* criminal activity was extremely thin, bordering on non-existent. Thus, as to 8 Mereline Avenue, the affidavit represents the type of "bare bones" or conclusory showing which does not satisfy the good faith exception. *See United States v. Leon*, 468 U.S. 897, 915, 926 (1984); *Illinois v. Gates*, 462 U.S. 213, 239 (1983); *Sheehan*, 70 F.4th at 52; *United States v. Robinson*, 359 F.3d 66, 70-71 (1st Cir. 2004). Plainly, "a reasonably well-trained law enforcement officer should be familiar with the fundamental legal principle that both the 'commission' and 'nexus' elements of 'probable cause' include an essential temporal component." *Zayas-Diaz*, 95 F.3d at 114–15; *Sheehan*, 70 F.4th at 54 ("[P]resenting sufficient probable cause of a crime . . . to justify the issuance of a warrant" is a "core competency of a police officer"). In other words, the affidavit's defects were not highly technical but, rather, went to the heart of the temporal component of both the commission and nexus requirements. These fundamental problems should have been noticed by an experienced law enforcement officer, as the affidavit established the affiant to be. *See United States v. Ricciardelli*, 998 F.2d 8, 16 (1st Cir. 1993) (explaining that the warrant "contained non-technical defects readily observable to experienced postal inspectors"); *United States v. Kosta*, 2013 WL 5934030, at *8 (D. Mass. Oct. 31, 2013) ("[I]t is difficult to characterize this case as the sort of conduct that can be insulated from the exclusionary rule, where the warrant's deficiency goes to the heart of the nexus requirement."). Accordingly, "an officer cannot be said to have relied on [the] warrant in good faith [because] the supporting affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Sheehan*, 70 F.4th at 51 (quoting *Leon*, 468 U.S. at 923); *see also id.* ("That a magistrate approved the warrant despite its obvious deficiencies does not mitigate the unreasonableness of the officer's conduct.").

The government does not persuasively contend otherwise, and in fact, makes only a generic attempt to do so. In its memorandum, with respect to the good-faith exception, the government "has done little more than to state, in a conclusory fashion, that there were sufficient facts indicative of probable cause such that it was not objectively unreasonable for the officers to have relied on the" warrant. *Sheehan*, 70 F.4th at 52. But the good-faith exception was not intended to be mechanically applied in a rote manner, and the government certainly cannot so heavily rely on and benefit from an unjustified assumption of being entitled to it. The court cannot apply the doctrine reflexively; good faith is, after all, an "exception" to the normal suppression rule and it is well established that the government bears a heavy burden to demonstrate good faith. The government, of course, must be strictly held to this and any other burden it routinely bears when exercising its law enforcement authority.

Ultimately, the court finds that the government has not satisfied its burden of "establish[ing] 'objectively reasonable' reliance on a defective warrant . . . based on all the circumstances." *Zayas-Diaz*, 95 F.3d at 114 (quoting *Leon*, 468 U.S. at 924). Accordingly, the good-faith exception does not apply and suppression is the appropriate remedy. After all, "[s]ubmitting a warrant application so deficient in probable cause such that no officer could reasonably rely upon it is exactly the kind of police conduct the exclusionary rule is meant to deter." *Sheehan*, 70 F.4th at 54. The value of deterring such conduct outweighs the cost of excluding the evidence discovered through the searches. "To hold otherwise would expand the good-faith exception to swallow, in a single gulp, the warrant requirement itself," *Sheehan*, 70 F.4th at 55, and would result in the abuse of the good-faith exception and erosion of Fourth Amendment protections. As the First Circuit has recently stated, "[t]hat cannot be the law." *Id.*

## IV. CONCLUSION

For the reasons set forth above, the court ALLOWS Defendant's Motion to Suppress (Dkt. No. 51).

_/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge